In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00194-CR


______________________________




MARK EDWARD COMPTON, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the County Court at Law


Gregg County, Texas


Trial Court No. 2001-2128




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



In the early hours of April 8, 2001, State Trooper Steven Baggett observed the truck driven
by Mark Edward Compton traveling at a speed Baggett said was approximately eighty miles per
hour. Compton slowed, came to a stop at a red traffic light, and then proceeded to drive through the
still-red light before Baggett pulled him over to the side of the road. When Baggett approached and
began questioning Compton, he noticed Compton's speech was slurred and his breath smelled of
alcohol. Compton admitted having earlier consumed two beers, and there was also an open bottle
of cold beer in the truck. At this point, Baggett began conducting Standardized Field Sobriety Tests
(SFSTs) to determine whether Compton was intoxicated. Based on Baggett's observations and
Compton's poor performance of the tests, Compton was subsequently arrested for driving while
intoxicated.

After a Gregg County jury convicted Compton of driving while intoxicated, he was sentenced
to 180 days' confinement, probated for two years, and ordered to pay an $800.00 fine. On appeal,
Compton contends that the trial court erred in denying his motion to suppress and that the evidence
presented at trial was both legally and factually insufficient to support his conviction. 

Analysis

A person commits the offense of driving while intoxicated if he or she operates a motor
vehicle in a public place without the normal use of mental or physical faculties due to the
introduction of alcohol or other substances into the body. Tex. Pen. Code Ann. §§ 49.01(2)(A),
49.04(a) (Vernon 2003). In determining whether a motorist is intoxicated, a law enforcement officer
with reason to suspect intoxication may conduct a series of field sobriety tests to aid in making arrest
decisions. Satisfactory performance of the tests suggests sobriety, while poor performance can serve
as a useful indicator of impairment.

At trial, Baggett testified it was only after evaluating Compton's performance of these tests
that he concluded Compton was intoxicated and placed him under arrest. Compton contends 
Baggett failed to properly administer the tests according to the guidelines published in the National
Highway Traffic Safety Administration's DWI Detection And Standardized Field Sobriety Testing
Student Manual, which is used in training Texas law enforcement officers. See generally Nat'l
Highway Traffic Safety Admin., U.S. Dep't of Transp., DWI Detection And Standardized Field
Sobriety Testing Student Manual (DWI Detection Manual). Compton reasons that
Baggett's failure to strictly comply with the DWI Detection Manual undermined the reliability of the
tests, thereby invalidating any evaluation of his performance. Under the Emerson three-part
reliability test, even if a test's underlying scientific theory and technique applying the theory are
valid, improper application of the technique would render the test unreliable. Emerson v. State, 880
S.W.2d 759, 763 (Tex. Crim. App. 1994) (citing Kelly v. State, 824 S.W.2d 568, 573 (Tex. Crim.
App. 1992)). Evidence resulting from such a test could not be considered legally or factually
sufficient to support a conviction.


A. Motion to Suppress

In his first point of error, Compton contends the trial court erred in denying his motion to
suppress evidence of two field sobriety tests, the horizontal gaze nystagmus (HGN) and one-legged
stand tests. We review the trial court's ruling for an abuse of discretion. Oles v. State, 993 S.W.2d
103, 106 (Tex. Crim. App. 1999). In doing so, we view the evidence in the light most favorable to
the trial court's ruling, State v. Ballard, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999), and afford
almost total deference to the trial court's determination of the facts supported by the record, State v.
Ross, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997). Determining the admissibility of scientific evidence, however, is a mixed question of
law and fact and is reviewed de novo. Hines v. State, 38 S.W.3d 805, 808 (Tex. App.-Houston [14th
Dist.] 2001, no pet.) (citing Guzman, 955 S.W.2d at 87).

In Emerson, the Texas Court of Criminal Appeals concluded that both the underlying theory
and the technique employed in administering the HGN test made it a sufficiently reliable indicator
of intoxication. Emerson, 880 S.W.2d at 768-69. Compton does not take issue with the
admissibility of tests in general, but argues that, because Baggett did not properly administer the
HGN and one-legged stand tests, the results of testing and any related testimony were unreliable and
should have been excluded. We disagree.

 


 1. HGN Test

The DWI Detection Manual outlines a battery of tests, including the HGN and one-legged
stand tests. When administering the HGN test, a law enforcement officer is trained to look for three
"clues" in each eye (a total of six for both eyes). Nystagmus, "an involuntary, rapid, rhythmic
movement of the eyeball," Dorland's Medical Dictionary 1162 (27th ed. 1988), is a natural
phenomenon that is exaggerated through the use of alcohol and certain other drugs; identification
of four out of six clues serves as a reliable indicator of intoxication and can be used by the officer
in determining whether to make an arrest. DWI Detection Manual, supra, at VIII-3, -8; see
Emerson, 880 S.W.2d at 768 ("The scientific materials addressing the issue have reached the uniform
conclusion that the consumption of alcohol has a cognizable effect on human eye movement . . .
the accuracy of those sources cannot be reasonably questioned.").

In determining whether a person's performance of the HGN test suggests intoxication, an
officer must look for the following clues in each eye: (1) the lack of smooth pursuit, (2) distinct
nystagmus at maximum deviation, and (3) the onset of nystagmus prior to forty-five degrees. DWI
Detection Manual, supra, at VIII-6. In other words, if the person's eyes fail to smoothly follow
a stimulus across the field of vision, exhibit nystagmus when held as far to the side as possible, or
display nystagmus at an angle prior to forty-five degrees from looking straight ahead, each will be
considered a clue indicating possible intoxication. Baggett testified at trial that Compton exhibited
five out of six clues; both eyes lacked smooth pursuit and displayed nystagmus at maximum
deviation, while one eye showed signs of nystagmus prior to forty-five degrees. 

Compton's principal argument against allowing the results of the HGN test to be introduced
into evidence is that Baggett failed to follow precisely the DWI Detection Manual's instructions for
administering both the smooth pursuit and maximum deviation portions of the test. Specifically,
Compton contends that Baggett administered the test too quickly and that, by moving the stimulus
within the field of vision and holding the eyes at maximum deviation for less time than procedure
recommends, the results of the test were rendered unreliable under Emerson and should not have
been considered. Even if Compton's estimate of the time it took for Baggett to perform these tests
was accurate, the difference between the time recommended and Compton's estimate is negligible.

The DWI Detection Manual's prefatory language acknowledges that although the tests, when
administered under ideal conditions, "will generally serve as valid and useful indicators of
impairment," slight variations from the ideal "may have some affect [sic] on the evidentiary weight
given to the results." Preface to DWI Detection Manual, supra. The Texas Court of Criminal
Appeals also notes that "[t]he accuracy of the HGN test has been estimated at various levels,
depending on such factors as testing conditions and the ability and experience of those conducting
the test," thus taking into account that the test will not be administered in strict conformity with an
officer's training every time it is performed. Emerson, 880 S.W.2d at 767. It would be unreasonable
to conclude that any variation in administering the tests, no matter how slight, could automatically
undermine the admissibility of an individual's poor performance of the tests.

Compton complains that Baggett administered the smooth pursuit portion of the HGN test
in eleven seconds instead of the sixteen seconds prescribed in the DWI Detection Manual (i.e.,
Baggett moved the stimulus two and a half seconds faster than recommended for each eye). The
manual itself only provides approximations of the time required for properly conducting the tests;
however, Compton reasons that the slightly increased speed with which Baggett administered the
test amounted to an inappropriate application of the technique, invalidating the results. This
conclusion is untenable and, if accepted, would effectively negate the usefulness of the tests entirely. 
Any variation in timing would require courts to exclude the results as unreliable.

Considering the maximum deviation portion of the HGN test, the DWI Detection Manual
indicates that an individual's eye should be kept at maximum deviation, or as far to the side as
possible, for a minimum of four seconds. With each eye being tested twice, Baggett should have
required Compton to maintain his eye position at maximum deviation for the minimum time stated
in the manual-four seconds per test, eight seconds for each eye. DWI Detection Manual, supra,
at VIII-7. The total testing time for nystagmus at maximum deviation, therefore, should require at
least sixteen seconds plus the time necessary to correctly position the eye to be tested. Compton
concedes that Baggett took nineteen seconds to perform this test, but argues that the test should have
taken at least thirty-two seconds-sixteen seconds to test at maximum deviation plus sixteen seconds
to position the eyes. Unlike the test for smooth pursuit, the movement of the eye from side to side
across the field of vision is irrelevant; instead, the test is to observe the eye for distinct nystagmus
in a specific position. Any variation in the time taken to appropriately position the eyes would have
no effect on the reliability of this test and cannot form the basis for excluding the results from the
evidence presented at trial.

 2. One-Legged Stand Test

Another of the tests outlined in the DWI Detection Manual is the one-legged stand test. As
suggested by its name, this test allows an individual to demonstrate his or her ability to remain
balanced while standing on only one leg. DWI Detection Manual, supra, at VIII-12. Failure to
remain balanced during the test or to comply properly with an officer's directions may serve as clues
of intoxication. Although one of the requirements for properly administering the test includes
instructing someone that his or her hands must remain to the side, Baggett's trial testimony clearly
indicated that he failed to do so. Compton subsequently used his hands to help himself balance and,
partially for this reason, performed poorly on this test. We must determine whether the trial court's
admission of the results of the one-legged stand test was harmless.

Under the harmless error standard for nonconstitutional error, we must disregard any error
that does not affect a substantial right. Tex. R. App. P. 44.2(b). "A substantial right is affected when
the error had a substantial and injurious effect or influence in determining the jury's verdict," King
v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United States, 328 U.S.
750, 776 (1946)); however, "[i]f the error had no or only a slight influence on the verdict, the error
is harmless," Apolinar v. State, 106 S.W.3d 407, 414 (Tex. App.-Houston [1st Dist.] 2003, no pet.)
(citing Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

Under the circumstances, even if the trial court's admission of the one-legged stand test
results did influence the jury's verdict, we deem that it "had but a slight effect" and that the admission
was harmless. Johnson, 967 S.W.2d at 417. In fact, Baggett's failure to instruct Compton to keep
his arms at his side should have made the test easier to perform. Even with the use of his arms,
however, Compton swayed from side to side, unable to balance himself on one leg. Baggett testified
that, "even without using his arms to balance, [Compton] still had enough clues on the one-leg stand
to be considered intoxicated." Nevertheless, when viewed in light of the other evidence presented
at trial, the results of the one-legged stand test are relatively insignificant. Baggett's uncontroverted
testimony at trial was that Compton ran a red traffic light; smelled of alcohol; had slurred speech;
admitted drinking two beers; had a cold, open bottle of beer in his truck; and became belligerent
when Baggett placed him under arrest. Compton also demonstrated five out of six clues on the HGN
test, refused to perform the walk-and-turn test, (1) and refused to submit to Intoxilyzer testing. 

B. Legal and Factual SufficiencyCompton contends in his second and third points of error that the evidence presented at trial
was both legally and factually insufficient to support his conviction. In reviewing legal sufficiency,
we view the evidence in the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 
Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); King v. State, 29 S.W.3d 556, 562 (Tex. Crim.
App. 2000). When reviewing the factual sufficiency of the elements of an offense, however, we
view all the evidence in a neutral light and "set aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust." Johnson v. State, 23
S.W.3d 1, 6-7 (Tex. Crim. App. 2000) (citing Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim.
App. 1996)).

Baggett testified he was certified to administer the field sobriety tests, had been updated on
the tests in 2000, and had performed the tests on many occasions. After pulling Compton to the side
of the road for speeding and running a red traffic light, Baggett noticed Compton's slurred speech
and the smell of alcohol on his breath. These factors-in addition to Compton's admitting drinking
two beers and Baggett finding a cold, open beer bottle in the truck-led Baggett to conduct the tests. 
Considering these factors alongside Compton's poor performance of the tests, we conclude there is
sufficient evidence on which a rational trier of fact could have found the essential elements of the
crime of driving while intoxicated.

In reviewing a claim that the evidence at trial was factually insufficient to sustain an
appellant's conviction, we "consider all the evidence in the record . . . comparing the weight of the
evidence that tends to prove guilt with the evidence that tends to disprove it" and "necessarily
consider any reasonable alternative hypothesis raised." Rumage v. State, No. 12-02-00190-CR, 2003
Tex. App. LEXIS 7232, at *9-10 (Tyler Aug. 20, 2003, no pet. h.) (citing Fuentes v. State, 991
S.W.2d 267, 271 (Tex. Crim. App. 1999); Richardson v. State, 973 S.W.2d 384, 387 (Tex.
App.-Dallas 1998, no pet.)). After listening to Baggett's testimony surrounding Compton's stop and
viewing the video recording of Compton's performance of the field sobriety tests, the jury chose to
give less weight to Compton's cross-examination, in which he attempted to discredit the reliability
of the tests as they were administered in this case. We defer to the jury's role as "the sole judge of
the weight and credibility given to witness testimony" and determine that the verdict is not so
contrary to the overwhelming weight of the evidence as to be wrong or unjust. Johnson, 23 S.W.3d
at 6-7.

Conclusion

Because there was no error in the trial court's denial of Compton's motion to suppress
evidence of the HGN test and the admission of the one-legged stand test results was harmless, we
conclude there is both legally and factually sufficient evidence to support the jury's verdict. 

We affirm the judgment of the trial court.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: September 16, 2003

Date Decided: September 18, 2003


Publish
1. Baggett testified that, even while he explained the walk-and-turn test and before Compton
refused to comply, Compton was unable to keep his balance. 



upreme Court has held that where defendants'
motion for new trial announced that they were ready to try the cause and that they would reimburse
the plaintiff for his costs in taking the default judgment, defendants satisfied the third prong of the
Craddock test. Strackbein, 671 S.W.2d at 39; HST Gathering Co. v. Motor Serv., Inc., 683 S.W.2d
743, 745 (Tex. App.-Corpus Christi 1984, no writ). This issue is a question of fact for the trial
court. 

 Along with his Motion for New Trial, George offered the following in his Affidavit: "A new
trial will not delay or prejudice the plaintiffs since my attorney and I are ready to try this case before
a jury. If Plaintiffs incurred any cost in taking the default judgment, I will reimburse them if I am
able." Nothing in the record suggests that the Smiths would suffer undue delay or injury. The
Smiths offered no contrary evidence, and no argument was offered on this issue at the January 11
hearing. Uncontroverted allegations are sufficient to conclusively establish questions of fact under
the Craddock test. See Strackbein, 671 S.W.2d at 38-39 (holding uncontroverted factual assertions
to be conclusive under the first prong of Craddock). Since George's factual assertions on this issue
are uncontroverted, they conclusively satisfy his burden on the third Craddock prong.

 The record shows George met all three prongs of the Craddock test. The trial court therefore
abused its discretion by refusing to grant the Motion for New Trial. See Moody, 830 S.W.2d at 85. 

Unliquidated Damages Award

 The trial court also committed reversible error by awarding unliquidated damages without
sufficient evidence to support the damages award. 

 A defaulting party admits all allegations of fact set out in the petition, except the amount of
damages. See Stoner v. Thompson, 578 S.W.2d 679, 684 (Tex. 1979). The damages issue separately
requires the plaintiff to prove a causal link between the plaintiff's injuries and the defendant's actions
to ascertain the amount of damages to which the plaintiff is entitled. Morgan v. Compugraphic
Corp., 675 S.W.2d 729, 732 (Tex. 1984). As the court held in Morgan,

 [T]he mandate of Rule 243 that the court hear "evidence as to damages" makes it
incumbent upon a party who obtains a default judgment in a personal injury action
to present competent evidence of a causal nexus between the event sued upon and the
party's alleged injuries.


Id. Rule 243 does not prescribe either the manner in which the hearing is to be conducted or the
character of the evidence which is required. Tex. R. Civ. P. 243. If damages are liquidated, no
hearing is necessary to present evidence of damages. Id. Rule 241 permits the trial court to assess
damages when the claim is liquidated and proved by an instrument in writing. Tex. R. Civ. P. 241;
Pentes Design, Inc. v. Perez, 840 S.W.2d 75, 79 (Tex. App.-Corpus Christi 1992, writ denied). 
Affidavits alone may be sufficient evidence to support an unliquidated damages award. Texas
Commerce Bank v. New, 3 S.W.3d 515, 516-17 (Tex. 1999). 

 The term liquidated as used in Rule 241 means that the amount can be calculated solely from
the instrument sued on and the factual allegations in the petition. Pentes Design, Inc., 840 S.W.2d
at 79. The written instrument must be attached to the petition. Abcon Paving, Inc. v. Crissup, 820
S.W.2d 951, 953 (Tex. App.-Fort Worth 1991, no writ); see also Alvarado v. Reif, 783 S.W.2d 303,
304-05 (Tex. App.-Eastland 1989, no writ) (affidavit verifying automobile repair estimate did not
transform unliquidated claim into liquidated claim). If liquidated claims are inadequately described
in the petition, they are considered unliquidated. Kelley v. Southwestern Bell Media, Inc., 745
S.W.2d 447, 448-49 (Tex. App.-Houston [1st Dist.] 1988, no writ). It is error for the trial court to
fail to conduct a hearing and to require proof of unliquidated damages before rendering a default
judgment for such damages. See Jones v. Andrews, 873 S.W.2d 102, 107 (Tex. App.-Dallas 1994,
no writ). 

 In the present case, the only information available to the court regarding damages was in the
form of medical records and summaries filed by the Smiths. The clerk's file contains some 220
pages of documents relating to medical expenses, treatment narratives, etc. These documents are
unsworn, unaccompanied by affidavits, and do not show that any of the treatments described therein
were reasonably necessary for the Smiths to incur as a result of their injuries. See Orkin
Exterminating Co. v. Davis, 620 S.W.2d 734, 737 (Tex. Civ. App.-Dallas 1981, writ ref'd n.r.e.). 

 These documents were filed with the clerk on November 1, 2000. The record shows that
although a hearing was scheduled to take place November 2, 2000, the Smiths cancelled the hearing. 
No hearing was held and no evidence presented regarding the damages award. The total amount
reflected in these documents is roughly $103,375. (3) The court rendered judgment for the Smiths on
November 6, 2000, in the amount of $575,000. That amount is over $470,000 greater than was
shown on paper by the plaintiffs. Not only is the latter amount unsupported by any documentary
evidence, the entire $575,000 is considered unliquidated under Abcon, Alvarado, and Kelley, because
no such evidence was attached to the petition or alleged therein. Further, the documents filed with
the clerk were unsworn and were unsupported by affidavits.

 If a no-evidence point is sustained as to unliquidated damages resulting from an uncontested,
no-answer default judgment, the appropriate disposition is remanded for a new trial on the issue of
unliquidated damages. See Heine, 835 S.W.2d at 86. The trial court erroneously failed to conduct
a hearing or to take evidence on unliquidated damages, and George would be entitled to an
evidentiary trial on this issue even if he had not satisfied the Craddock test.

No Record from which to Challenge Facts

 George also points to a separate error in granting the default judgment, because no record
exists by which he is able to challenge the sufficiency of the evidence to support the judgment. If
a defendant, through no fault of his own, is unable to procure a record of the evidence introduced,
a new trial will be required. Smith v. Smith, 544 S.W.2d 121, 123 (Tex. 1976); Alvarado, 783
S.W.2d at 304-05. Since no hearing was held and no evidence presented, there is no record from the
trial court regarding the damages award. Because George is entitled to a new trial on the merits,
however, we do not reach this point of error.

Conclusion

 The record shows George met all three prongs of the Craddock test. The trial court therefore
abused its discretion by refusing to grant the Motion for New Trial. See Moody, 830 S.W.2d at 85. 

 The judgment of the trial court, granting a default judgment, is hereby vacated, and the cause
is remanded to the trial court for trial on the merits.



 Ben Z. Grant

 Justice


Date Submitted: September 20, 2001

Date Decided: January 25, 2002


Do Not Publish
1. George also complains that the trial judge conducted a "summary mini-trial" on this point
by considering evidence contrary to George's allegations at the hearing on his Motion for New Trial. 
When considering the meritorious defense prong of Craddock v. Sunshine Bus Lines, 134 Tex. 388,
133 S.W.2d 124 (1939), the trial court should not deny the motion on the basis of any contradictory
affidavits or testimony offered by the opposing party. Guaranty Bank v. Thompson, 632 S.W.2d 338,
339 (Tex. 1982). The court did consider the merits of this defense, which was improper. There is
no reversible error, though, because George failed to allege sufficient facts to set up the defense.
2. The Smiths cite Pollack for the proposition that contested issues are ordinarily decided after
an evidentiary hearing at which live testimony is taken. See Estate of Pollack v. McMurrey, 858
S.W.2d 388, 392 (Tex. 1993). This argument, though, ignores the footnote to the same paragraph,
wherein the Texas Supreme Court expressly distinguishes the conscious indifference prong then at
issue (a fact question) from the meritorious defense prong (a legal question) for which the no-contrary-evidence rule was established in Guar. Bank v. Thompson, 632 S.W.2d 338, 339 (Tex.
1982). Pollack, 858 S.W.2d at 392 n.3.
3. Total medical expenses taken at face value from plaintiffs' summary pages.